## KELLY HUNT V. THE STATE.

No. 15253. Delivered March 22, 1933.
Reported in 58 S. W. (2d) 523.

LATTIMORE, Judge, dissenting.

The opinion states the case.

*Robertson & Friberg* and *J. Earl Kuntz,* all of Wichita Falls, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—As the record is understood, the testimony showing the guilt of the appellant is the following: About the 16th of January, 1931, the bank at Dundee, Texas, was burglarized. The burglary took place during the night. A safe weighing 2,000 pounds was carried away in a truck which was used by the principal offenders. A sum of money amounting to about $900.00 was taken from the bank. An official of the bank remembered the figures on the combination of the safe, which were 20-40-60-80. However, he did not remember the number of turns necessary in opening the safe.

From the testimony of Hunter Russell, the following appears: The witness had lived at the home of Kelly Hunt for about three or four years and lived there in January, 1931. He had seen Erwin Spicer at the Hunt home during the month of January, 1931. Spicer lived at Abilene. According to the witness' testimony he, Spicer, Wethered, and Hunt committed the burglary. In making preparations for the burglary, Wethered, Spicer, and Russell used a truck which had been stolen by the latter in Wichita Falls, Texas. Arrangements were made at Hunt's house, he participating therein. Russell, Spicer, and Wethered went to Hunt's house in the truck. Hunt followed the truck in a Ford car. Upon reaching the town of Dundee, the combination of the vault in which the safe was in-

closed was knocked off by Wethered and Russell. The truck was then driven to the sidewalk and the safe placed in it by the four men, Wethered, Russell, Spicer, and Hunt. Wethered and Russell returned in the truck while Hunt and Spicer rode in Hunt's car. The safe was taken to Hunt's pasture and deposited at a place about three-quarters of a mile from his home. The witness did not know the size of the pasture. They entered the pasture about daylight on a road which could be seen from Hunt's house. They then drove around to a rock house about three-quarters of a mile from Hunt's house. They unloaded the safe and tried to bury it. After unloading the safe the truck was taken over to Archer county by Hunt and Russell. In unloading the safe the combination was knocked off. Being unable to open the safe, Hunt procured a man by the name of McClelland, who came out at night and burned an opening into the safe with a torch. He burned a six-inch hole across the top of the safe. By that means the parties got the money from the safe, which was divided between Hunt, Spicer, Wethered, and Russell. The parties later put the safe on a sled and carried it to the river, where they threw it in. The instruments used in burning the hole in the safe were thrown into the river at the same time that the safe was thrown therein. In October, 1931, Russell accompanied the officers to the locality where the safe was thrown into the river. They went in the river and recovered the acetylene and oxygen tanks which were used in opening the safe.

The agreement to commit the burglary was made the day before it was committed. The plans were made at Hunt's house and he was present at the time. Hunt and Russell were engaged in the bootlegging business. All of the above comes from the accomplice Russell.

Britton visited Hunt's place in September, but the year is not stated. He was in company with Spicer. Britton was shown what was said to be Hunt's home. He and Spicer went into the place through a pasture and then went to the river. They came to a rock house and made a search about a quarter of a mile from the rock house. He was shown by Spicer where they had put the safe and where it had been burned open. There had been a hole dug with some brush piles over it, and something which the witness called "stuff" found. It was turned over to Mr. Wylie. They also found a chisel. They found a nickel, a piece of iron or steel and a piece to the combination of the safe. All of these were buried under the dirt and brush near the place where Spicer claimed that the safe had been burned open. Spicer showed the witness a place

where he claimed the safe had been rolled into the river. This place was about half a mile from where he claims the safe was burned open. The witness noticed an attempt to dig a hole of considerable size near the place where it is claimed the safe was burned open and where the iron and "stuff" were found. There was brush sticking up in the river and indications that something had been dumped therein. Britton knew nothing as to whether the pieces found came from the bank safe except from Spicer's statement. All he knew was what Spicer told him. A piece of the combination was found where Spicer claimed the safe had been burned open. All of the stuff that the witness testified to was there.

The state's witness, McDaniel, testified that Hunter Russell had told him where the safe was, and accompanied him to the place where it had been dumped into the river. Russell pulled off his clothes and jumped into the river. When he came up, "he had one of these tanks." The witness also went in the river, stumbled over something, and picked up another tank. They were acetylene and oxygen tanks. There was indication that something had been dumped into the river over the bank.

Shortly after the burglary the truck was found on the highway.

Pieces of iron or steel supposed to have been a part of the safe were exhibited to the jury.

Andrew Young testified that sometime after the 29th of September, 1931, a piece of a combination of a safe was brought to him for examination by McDaniel, sheriff of Archer county. The witness said that the piece exhibited to him looked pretty much like the one that McDaniel had brought to him. It was brought in to see if the witness could remember the numbers that were on the safe at Dundee, as he had set the combination a year before the burglary took place. The numbers on the combination were 20-40-80. The witness identified pieces of the safe combination which were turned over to him by McDaniel. There was no "60" on the combination which was examined by the witness. The combination looked like the same as that which was on the safe. The witness said he would not swear that the combination was from the Dundee bank safe.

There was testimony from the witness Young and other witnesses on the subject of the identity of the combination of the safe, but nothing more specific than that related above.

Holmes, the sheriff, of Baylor county, testified that there were two ways of entering Hunt's pasture from the Seymour road; also that he had been to the place where the safe was

supposed to have been deposited in the river. While he made no examination, it was his opinion that Hunt's pasture might not be seen from that locality.

It appears that Spicer was seen living on Hunt's place after the latter had been arrested.

The witness McClelland was arrested but not indicted.

The direct testimony pointing to the guilt of the appellant comes from witnesses who were accomplices alone. The circumstances which are supported by other testimony than that of the accomplices are understood by the writer to be the following: Britton who visited Hunt's place some months after the date of the alleged offense, verified the testimony of the accomplice Spicer to the effect that there had been a hole dug with some brush piled over it, in which there were found certain articles, namely, a chisel, piece of iron, a nickel, and a piece of the combination of the safe. All these were found about half a mile from the locality mentioned. McDaniel visited Hunt's place in company with Hunter Russell. In wading the river, they found two tanks—one an acetylene and the other an oxygen tank. There was a place which indicated that something had been dumped into the river. There was a brush sticking up. Apparently something had slid off the bank. There was an unsuccessful effort to identify the piece of the safe by the numbers on the combination. In reaching the place where the articles were found in the river, persons traveling on the road in a vehicle would pass the home of Hunt. One of these routes would be near his door, while the other would be more distant. Russell claimed that they passed Hunt's house about daylight. Hunt was engaged in bootlegging together with the witness Russell, who had at times resided at Hunt's house.

To the mind of the writer, the above matters pointed out are not sufficient to meet the demand of the law requiring corroboration of the accomplice witnesses. The force of the testimony to which reference is made above is very much weakened and rendered less cogent as corroborative testimony by the fact that a safe weighing 2,000 pounds which the accomplices claimed was put in the river at or near the place where the tanks were found in the river, was never seen by any of the nonaccomplice witnesses, but their efforts to locate it in the river were unsuccessful.

The judgment should be reversed and the cause remanded.

*Reversed and remanded.*

LATTIMORE, Judge, dissents.

HAWKINS, JUDGE (concurring).—I concur in the opinion reversing the judgment because of the insufficiency of the evidence corroborating the accomplice witnesses. It is the judgment of the writer that the evidence outside of that given by the accomplices established only that one of them worked for appellant and stayed at his house, and that the other had been seen at his house; that the remnants of the bank safe lock were found on appellant's premises and acetylene drums were found in the river at a point where it touched appellant's land, the location of the lock and drums having been pointed out by the accomplice witnesses, who also claimed the safe had been thrown in the river at the same place where the drums were found. Although the safe weighed two thousand pounds it was never found, notwithstanding diligent search was made for it. This, at least, was a singular incident. In getting to the place where the accomplices say the safe was burned open it is likely a road was traveled which passed within fifty or one hundred yards of the house in which appellant lived. No evidence other than that of the accomplice witnesses attributed to appellant any knowledge that the safe, remnant of the lock, and drums were ever in his pasture. The circumstances testified to by nonaccomplice witnesses are not thought sufficient to charge him with such knowledge. The sheriff testified that he did not think appellant's house could be seen from the point where the combination of the safe and other articles were found buried. If appellant was ignorant of the presence on his premises of the things mentioned, their presence would have no tendency to connect him with their acquisition. The evidence of the nonaccomplice witnesses, in the opinion of the writer, does not measure up to the requirements of article 718, C. C. P.

I respectfully concur in the disposition of the case.

LATTIMORE, JUDGE (dissenting).—My associates on the bench think this case should be reversed for lack of corroboration of the accomplice Russell. I am sorry not to be able to agree with them, but the only requirement of our law fixing the extent of the corroboration of an accomplice is, that such conviction should be upheld if there be testimony in the record other than that of the accomplice *tending of itself to connect the accused with the commission of the crime.* See article 718, C. C. P. In this case Russell, the accomplice, fully made out a case against appellant as being one of four who burglarized a bank building at Dundee, stole the safe and its contents, carried them in a truck to appellant's ranch, where the safe

was first buried in the ground near a rock house on said ranch, then dug up and a strip melted or cut across the door of the safe by the use of an acetylene torch, the contents removed and divided, and the safe and the oxygen and acetylene tanks thrown into a river which ran through appellant's said ranch.

By others than the accomplice the burglary was proved, as was the fact that in appellant's pasture near said rock house, after the burglary, a large hole was found over which brush had been piled. Under the brush and dirt at said hole were found pieces of steel, a chisel, a nickel, and a part of the combination of a safe having on it the same numbers as were on the combination of the safe taken. Flatt, cashier of said bank, testified that the figures on the combination of the stolen safe were 20-40-60-80, but that he did not remember the order in which they came. The melted and burned strip off the door of the safe found beneath the brush and dirt at the hole in appellant's pasture was shown to Mr. Young, a safe expert, who testified that he had set the combination on the bank safe at Dundee before the burglary, and further that sheriff McDaniel turned over to him for examination and identification the melted and burned strip of the safe door, and that it *bore the same numbers as did the Dundee bank safe.* He testified:

"The numbers on this piece of combination that Mr. McDaniel turned over to me are the same as the numbers of the combination on the safe at Dundee, and these numbers work out 20-40-80."

He further said that the Dundee bank safe was a Victor safe, having a screw door of the Yale type, and that the melted and burned steel strip containing the combination showed him, was from such a safe. Witnesses other than the accomplice also testified that they went down to a point on the river in appellant's pasture where they saw a place where it looked as if a heavy object "had been dumped over the bank," and in the water at this place they found an oxygen tank and an acetylene tank.

That the finding of stolen property, or things used in connection with the disposition of such property, in. appellant's pasture, over which there is no suggestion that other people had any control after the burglary, would be held material and admissible against appellant on his trial for the burglary and theft, in any court. That they tend to connect him with the taking of the property thus found, seems so evident to my mind that I can not rid myself of a belief that it sufficiently measures up to the requirements of the law in regard to the corroboration of an accomplice. It is not required that the

corroborative testimony be strong enough of itself to make out a case, but it is enough if it meet the statutory requirement and "tend to connect the accused with the offense." If these things had been found in appellant's personal possession, such finding would have sufficed to make out a complete case of guilt against him without need for the testimony of the accomplice. Being found in his house, or on his premises, or in his pasture, would in any case tend to show guilt on his part. Many a man has been convicted because of the finding of stolen cattle in his pasture. I am, therefore, compelled to record my dissent, which is respectfully done.